# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163 <br><br> THIS DOCUMENT RELATES TO ALL CASES <br><br> JUDGE KAREN SPENCER MARSTON |
| COLLEEN GENOVESI, <br>          Plaintiff, <br><br> v. <br><br> NOVO NORDISK INC. and NOVO NORDISK A/S, <br>          Defendants. | COMPLAINT AND JURY DEMAND <br><br> CIVIL ACTION NO.: |

## DIRECT FILING ORDER AND VENUE

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the District of Massachusetts as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

  X   Plaintiff currently resides in Rehoboth, Massachusetts.

  X   Plaintiff purchased Defendants' products in Attleboro, Massachusetts and used Defendants' products in Rehoboth, Massachusetts.

___ The Original Venue is a judicial district in which Defendant _____ resides, and all Defendants are residents of the State in which the district is located (28 U.S.C. § 1391(b)(1)).

_X_ The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): the products at issue here were sold and used in the Original Venue and Plaintiff suffered her injuries in the Original Venue.

___ There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendant _____ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

___ Other reason (please explain): _____.

## INTRODUCTION

1. This is an action for damages suffered by Plaintiff, Colleen Genovesi, who was severely injured as a result of her use of GLP-1 receptor agonists ("GLP-1 RAs")—specifically Ozempic, a prescription medication that is designed, researched, tested, manufactured, marketed, supplied, promoted, advertised, packaged, labeled, sold and/or distributed by Defendants.

2. Ozempic belongs to a class of drugs called GLP-1 RAs, and it is an injectable prescription medication that is approved for improvement of blood sugar (glucose)

2

in adults with Type 2 diabetes and weight loss. The active ingredient in Ozempic is known as "semaglutide." Other drugs and active ingredients detailed below also fall within the GLP-1 RA class, based on similarities in their mechanisms of action, physiologic effects, and chemical structure.

3. Defendants have failed to provide adequate warnings about adverse events caused by their GLP-1 RAs, including non-arteritic anterior ischemic optic neuropathy ("NAION"), which can result in blindness and permanent vision loss, as well as blurry and/or darkened vision, which may lead to falls and other injuries.

4. As a result of the foregoing, Plaintiff has suffered and was diagnosed with NAION and its sequelae directly and proximately caused by Plaintiff's regular and prolonged use of Ozempic.

## PARTIES

5. Plaintiff Colleen Genovesi is a citizen of the United States and a resident of the Commonwealth of Massachusetts.

6. Plaintiff is sixty-eight (68) years old.

7. Plaintiff was prescribed Ozempic by her physician, and Plaintiff took Ozempic as directed by her physician.

8. As a result of using Ozempic, Plaintiff suffers from left eye vision loss, secondary to the development of non-arteritic anterior ischemic optic neuropathy ("NAION") and its sequelae, including permanent vision loss, blurry and/or

darkened vision and injuries related thereto, resulting in severe personal injuries, pain, suffering, and emotional distress, and incurred medical expenses.

9.  Defendant Novo Nordisk Inc. is and at all relevant times has been a Delaware corporation with a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey.

10.  Defendant Novo Nordisk A/S is and at all relevant times has been a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsværd, Denmark.

11.  Defendants Novo Nordisk Inc. and Novo Nordisk A/S are referred to collectively herein as "Defendants."

12.  At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed GLP-1 RAs, including Ozempic, Wegovy, Rybelsus, Victoza, and Saxenda. Alternatively, Defendants acquired the entities that designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed such GLP-1 RAs, and is therefore the successor to such entities.

13.  At all relevant times, each Defendant conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of GLP-1 RAs within the state in which Plaintiff resides.

## JURISDICTION

14.   This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because Defendants are incorporated and have their principal places of business in states other than the state in which Plaintiff resides, which is Massachusetts.

15.   This Court has supplemental jurisdiction over the remaining common law and state-law claims under 28 U.S.C. § 1367.

16.   This Court has personal jurisdiction over each Defendant because Novo Nordisk Inc. is an agent and alter ego of Novo Nordisk A/S, and both entities maintain systematic and continuous contacts and regularly transact business in this district and in Massachusetts, which embraces the Original Venue defined on page 1, supra.

## FACTUAL ALLEGATIONS

**A. GLP-1 and GLP-1 RA products.**

17.   Researchers first discovered GLP-1 in 1983. It is a hormone that helps regulate blood sugar, appetite, and digestion in animals, including humans, and is produced naturally in the brain and intestinal wall of humans.

18.   Medications within the GLP-1 RA class of drugs mimic the activities of physiologic GLP-1 by attaching to GLP-1 receptors, triggering a sensation of satiety,

acting on the pancreas to stimulate the release of insulin, suppressing the release of glucagon, and slowing or inhibiting gastric emptying and intestinal motility.

19.  Various active ingredients fall within the GLP-1 RA class of drugs, including semaglutide (marketed by Defendants as Ozempic, Wegovy, and Rybelsus), liraglutide (Saxenda and Victoza), and tirzepatide (Mounjaro and Zepbound). The FDA recognizes GLP-1 RAs as a class of drugs based on similarities in their mechanisms of action, physiologic effects, and chemical structure.

20.  The active ingredient in Ozempic is semaglutide, which has a half-life of well over 100 hours—much longer than naturally occurring GLP-1. This causes the drug to remain in the body for a month or more after the last dose. Ozempic's half-life was much longer than that of its predecessor Saxenda (a liraglutide product), and thus required less frequent injections. Ozempic also caused three times the weight loss as did Saxenda.

21. Ozempic was approved by the FDA to treat Type 2 diabetes in adults. Defendants also marketed semaglutide under the brand name Wegovy for chronic weight management.

**B. NAION and its sequelae.**

22.  Non-arteritic anterior ischemic optic neuropathy ("NAION") is a medical condition involving damage to the optic nerve resulting in loss of vision.

23.  NAION is irreversible and permanent. It falls within the category of an

"eye stroke" and is untreatable and can lead to permanent blindness.

24. The general medical belief is that NAION is caused by insufficient blood supply or ischemia to the optic nerve.

25. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy. Approximately 8% to 12% of patients experience accompanying pain such as a headache or periocular pain. Vision loss may occur over hours to days, but many patients notice loss upon waking in the morning.

26. After glaucoma, NAION is the second-most common cause of blindness due to optic-nerve damage. Some NAION patients lose complete vision with no recovery in affected eyes. Approximately 15% of patients who develop NAION in one eye eventually develop it in the other.

27. Reduced vision or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive, cannot read, and may be unable to continue in their employment. Loss of vision in one or both eyes results in bumps, falls, and injuries.

## C. Evidence of a causal link between Ozempic and NAION.

28. GLP-1 receptors are widely expressed in the central nervous system and throughout the vascular supply of the optic nerve. GLP-1 RAs such as semaglutide have vasoactive properties capable of altering blood flow to the optic nerve head,

thereby creating conditions that precipitate NAION.

29.  Defendants knew or should have known, through clinical trials, adverse event reporting, pharmacovigilance, scientific literature, and other sources, that use of Ozempic and related GLP-1 RAs was causally associated with the development of NAION.

30.  Defendants knew, or in the exercise of reasonable care should have known, of the increased risk of NAION associated with Ozempic and other GLP-1 RAs, yet they concealed and failed to disclose that risk to prescribing physicians, the medical community, patients, and the general public, including Plaintiff and Plaintiff's prescribing physician.

31.  Despite the post-approval scientific evidence, adverse-event reports, and pharmacovigilance signals described herein, Defendants did not update Ozempic's United States labeling, Medication Guide, prescribing information, or other physician- and patient-directed communications to disclose the risk of NAION; did not issue "Dear Doctor" letters or other safety communications to the medical community; and did not modify their direct-to-consumer or healthcare-provider marketing to reflect the risk.

32.  Published peer-reviewed research, including a July 2024 study in JAMA Ophthalmology, found that individuals taking semaglutide had a significantly elevated risk of developing NAION compared to those taking other weight-loss and

diabetes medications. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with Type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.

33.    The study "Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide," authored by Hathaway et al., noted a surge of NAION cases among patients prescribed semaglutide and undertook a retrospective, matched cohort study to evaluate signals of ocular side effects such as NAION. What it found is that the use of Ozempic is associated with an increased risk of NAION.

34.    The Hathaway findings have since been corroborated by multiple independent studies.

35.    Defendants' own clinical-trial data flagged the signal years before the Hathaway publication. In the Novo Nordisk-sponsored "SUSTAIN FORTE" trial— whose results were first submitted in August 2021—a participant developed optic ischemic neuropathy, which was categorized in the trial record as a serious adverse event. The study group to which this participant belonged contained only 479 participants; the occurrence of even one optic-ischemic-neuropathy event in such a small cohort is significant given the very low background incidence of NAION in

the general population.

36. Post-market adverse-event reports in the FDA's Adverse Event Reporting System ("FAERS") included reports of NAION associated with semaglutide use prior to and during Plaintiff's use of Ozempic.

37. The FDA itself has stated that, "[g]iven the severe and irreversible nature of NAION and the growing popularity of GLP-1 RA, [the FDA] aim[s] to evaluate the previously observed safety signal with respect to NAION using a principled approach to study design and analysis," and has commissioned a non-randomized cohort study analyzing insurance-claims data through the FDA Sentinel System's RealWorld Evidence Data Enterprise. That study, which remains ongoing, includes patients exposed to GLP-1 RA medications indicated for treatment of Type 2 diabetes, including Ozempic.

38. In January 2025, the Pharmacovigilance Risk Assessment Committee ("PRAC") of the European Medicines Agency, prompted by cohort findings in Novo Nordisk A/S's home country of Denmark, required Defendants to review and submit available data relating to semaglutide and NAION. In response, Novo Nordisk publicly acknowledged that confirmed cases of NAION had been identified within its clinical trials.

39. Five months later, in June 2025, the European Medicines Agency determined, through its PRAC, that the product information for semaglutide

medicines— including Ozempic and others—should be updated to include the risk of NAION, and that patients experiencing sudden vision loss should contact a physician immediately and discontinue the medication if NAION is confirmed.

40.  As of September 2025, § 4.4 of the European labeling for Ozempic and Wegovy ("Special warnings and precautions for use") states: "Data from epidemiological studies indicates an increased risk for non-arteritic anterior ischemic optic neuropathy (NAION) during treatment with semaglutide. There is no identified time interval for when NAION may develop following treatment start. A sudden loss of vision should lead to ophthalmological examination and treatment with semaglutide should be discontinued if NAION is confirmed." Similarly, § 4.8 of the European label ("Undesirable effects") warns of an "approximately two-fold increase in the relative risk of developing NAION, corresponding to approximately one additional case per 10,000 person-years of treatment." The European Package Leaflet now directly warns patients of the NAION risk.

41.  Despite these changes to European labeling and the other information available to Defendants, no comparable warning appears on Ozempic prescriptions sold in the United States. In the United States, Defendants have failed to include any warning regarding NAION in Ozempic's labeling, prescribing information, package insert, or Medication Guide, and failed to communicate any warning to the medical community, Plaintiff, Plaintiff's healthcare providers, or the general public.

42. According to the FDA's public Drugs@FDA records, the label for Ozempic has been updated repeatedly since its 2017 approval. Yet none of the iterations of Ozempic's United States label have ever contained any warning, precaution, or other information regarding the increased propensity of Ozempic to cause NAION and permanent vision loss as suffered by Plaintiff.

43. To date, Ozempic and Wegovy warning labels remain devoid of any mention of NAION.

44. Defendants' disregard of post-approval safety obligations has drawn recent FDA enforcement action. In February 2026, the FDA's Office of Prescription Drug Promotion ("OPDP") issued a notice to Novo Nordisk Inc. stating that a direct to-consumer promotional video for Ozempic was false or misleading, that it misbranded Ozempic in violation of the Federal Food, Drug, and Cosmetic Act, and that it included claims and presentations misrepresenting Ozempic's efficacy.

45. In March 2026, the FDA issued a Warning Letter to Novo Nordisk Inc. citing the company's failure to develop written procedures for the surveillance, receipt, evaluation, and reporting of post-marketing adverse drug experiences as required by 21 C.F.R. § 314.80(b), including the agency's findings as to potential unreported semaglutide side effects and deaths.

46. Defendants have failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to

12

encourage a baseline eye exam before starting Ozempic, monitoring of patients while on the medication, advising patients to stop using the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

47. Nothing was or is stopping Defendants from adding a warning regarding the risk of NAION. Defendants could have at any time made "moderate changes" to the labels. Defendants could have filed a "Changes Being Effected" ("CBE") supplement under the Federal Food, Drug, and Cosmetic Act and its regulations to make "moderate changes" to Ozempic's label without any prior FDA approval. See 21 C.F.R. § 314.70(c). They did not.

48. Examples of moderate label changes that can be achieved through a CBE supplement include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." 21 C.F.R. § 314.70(c)(6)(iii). Thus, by definition and by regulation, changes to add a warning based on newly acquired information—such as that imparted by the post-approval clinical, epidemiological, and pharmacovigilance literature described above—are considered a "moderate change" available through the CBE process.

49. The Third Circuit has reaffirmed this plain-text reading of the CBE process, observing that a pharmaceutical defendant cannot rely on impossibility preemption based on an alleged conflict between federal labeling law and state tort

duties if the warning could have been effected via a CBE change. See *In re: Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 118 F.4th 322, 357 (3d Cir. 2024) (noting "the availability of a label change via a CBE supplement is problematic for [the defendant], as will very often be the case for pharmaceutical companies raising an impossibility defense").

## D. Defendants' marketing of Ozempic.

50.   Defendants engaged in an expansive and multifaceted marketing campaign to promote Ozempic and its other GLP-1 RA medications in the United States across television, digital and social media, print, healthcare-provider detailing, advocacy and lobbying organizations, celebrity partnerships, telemedicine channels, key opinion leaders, and other public outlets.

51. In July 2018, Defendants launched their first television advertisement for Ozempic featuring a jingle adapted from the 1970s pop song "Magic" by Pilot, in which Defendants advertised that "adults lost on average up to 12 pounds" when taking Ozempic. At that time, Ozempic was approved only for the treatment of Type 2 diabetes and was not approved for weight loss. Defendants nevertheless promoted weight-loss messaging in their consumer advertising.

52.   Over the five years following the 2018 launch, Defendants spent approximately $884 million on television advertising in the United States to promote semaglutide products, including Ozempic. They reportedly spent around $100

14

million advertising Ozempic in 2022 alone, ranking Ozempic among the most-advertised prescription drug brands in the United States that year. In 2023, a leading industry publication declared Ozempic "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."

53.   Defendants' digital and social-media marketing has included over 4,000 advertisements for Ozempic and similar weight-loss medications placed on Facebook, Instagram, and other social-media platforms. Defendants partnered directly with Meta and Instagram to run marketing campaigns, including a diabetes-marketing campaign that achieved an impressive 28% direct engagement rate.

54.   According to data published on the Centers for Medicare & Medicaid Services Open Payments database, Novo Nordisk spent nearly $34 million on payments to physicians for marketing, consulting, travel, food and beverage, and related items in calendar year 2022 alone.

55.   Throughout these campaigns, Defendants have promoted, and continue to promote, Ozempic as a safe and well-tolerated medication, describing its side-effect profile as minimal and primarily limited to gastrointestinal effects, while omitting known risks including the risk of NAION.

56.   Beyond paid advertising, Defendants worked to influence the medical and public-health establishment's view of obesity and the appropriate treatment for it. Defendants own and operate marketing-campaign websites—including "The Truth

About Weight"—directed at reframing public and clinical understanding of obesity.

57.  Defendants devoted substantial resources to building relationships with physician credentialing bodies, advocacy groups, and lobbying organizations. These include:

a.  the American Board of Obesity Medicine ("ABOM"), whose former Director (serving from 2017 through November 2021) received payments from Novo Nordisk during her tenure as Director, and at least one ABOM member who participated in writing the obesity-management guidelines received direct payments from Novo Nordisk during the same period in which those guidelines were authored;

b.  the Obesity Action Coalition, to which Novo Nordisk has contributed substantial money and with which Novo Nordisk has been a partner since 2013—years before any Novo Nordisk product was approved for weight loss;

c.  the Corporate Council of the American Society for Metabolic and Bariatric Surgery, on which Novo Nordisk serves;

d.  the Stop Obesity Alliance, of which Novo Nordisk is a corporate member and direct financial contributor; and

e.  the Obesity Care Advocacy Network, an obesity-related lobbying organization that advocates for legislation expanding access to

Defendants' drugs.

58. Defendants also funded continuing-medical-education courses used to satisfy continuing-education and certification requirements in obesity medicine.

59. As a result of Defendants' marketing, Ozempic and related GLP-1 RAs became among the most widely prescribed drugs in the United States. In July 2021, physicians wrote around 62,000 prescriptions for Ozempic per week, a figure that reached an all-time high of approximately 373,000 prescriptions in a single week in February 2023, with more than half of those being new prescriptions. Sales of Ozempic in the United States exceeded $3.7 billion in the first six months of 2023 alone. The U.S. GLP-1 RA market is expected to exceed $100 billion by 2030.

60. Defendants further extended their marketing reach by directly and indirectly partnering with telehealth providers who prescribe weight-loss medications, often including off-label use of GLP-1 RAs:

    a. In 2019, Novo Nordisk entered a direct partnership with Noom, a digital weight-loss company. In 2021, Novo Holdings participated in a $540 million Series F financing round for Noom and continues to list Noom as a venture investment. Noom currently has more than 45 million users and, through Noom Med, prescribes weight-loss medications directly to consumers, including off-label uses promoted on its website.

    b. WeightWatchers acquired the telehealth provider Sequence for around

$132 million to provide weight-loss medications to its subscribers.

c. Calibrate, another telehealth provider focused on weight-loss medications, raised $100 million in capital in 2021.

d. Collectively, the telehealth providers that Defendants directly and indirectly partner with or promote accounted for about half of all weight-loss prescriptions written in the United States in 2022.

61. Defendants also deceptively promoted Ozempic and related semaglutide products through ostensibly independent media. On January 1, 2023, the news program 60 Minutes aired a feature on GLP-1 weight-loss drugs. Public-health and consumer organizations subsequently filed complaints alleging the segment was, in substance, deceptive marketing because the physicians interviewed had received payments from Novo Nordisk that were not adequately disclosed to viewers. The U.S. Food and Drug Administration is currently investigating Defendants' marketing practices.

**E. Plaintiff Colleen Genovesi's specific facts.**

62. Plaintiff Colleen Genovesi was prescribed Ozempic for the treatment of Type 2 diabetes in June 2024.

63. Plaintiff used Ozempic as intended for approximately two (2) years.

64. In approximately early June 2026, Plaintiff experienced sudden blurry vision in her left eye that progressively worsened.

65. Plaintiff was subsequently evaluated by a series of providers, including a neuro-ophthalmologist, and she was diagnosed with NAION diagnosis of the left eye.

66. As a result of Defendants' actions and inactions, Plaintiff suffers from severe vision loss in her left eye, which impacts her activities of daily living, including her ability to work. She seeks damages associated with these injuries.

67. Ms. Genovesi suffered a significant loss of visual acuity in her left eye.

68. Ms. Genovesi's loss of her eyesight is permanent.

69. At all times material to the above, the Ozempic label failed to adequately warn Ms. Genovesi and her medical providers of the true risks of taking Ozempic.

70. Ms. Genovesi's life is forever changed because of her usage of Ozempic.

71. Ms. Genovesi will never see clearly ever again as a result of her usage of Ozempic.

72. Defendants knew or should have known that the use of semaglutide could lead to severe and debilitating injuries, such as those suffered by Plaintiff and numerous other patients.

73. At all times relevant hereto, Defendants represented Ozempic to be appropriate, safe, and suitable for its intended use, and did not warn Plaintiff or Plaintiff's prescribing physician of the risk of NAION.

74. Defendants continue to downplay the risk of NAION and has not changed

19

or provided any warnings to the public and medical community.

75. Defendants' Ozempic was at all times utilized and prescribed in a manner foreseeable to the Defendants.

76. Plaintiff used Ozempic, and did not misuse, or alter Ozempic in any unforeseeable manner.

77. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and her physicians the true and significant risks associated with this medication.

78. As a result of Defendants' actions, Plaintiff and her physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

79. As a direct result of being prescribed and using Ozempic, Plaintiff has been permanently and severely injured, having suffered serious consequences.

80. As a direct and proximate result of her Ozempic use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

81. Plaintiff and Plaintiff's healthcare providers reasonably relied on Defendants' representations, labeling, and promotional materials, in prescribing

20

Ozempic to Plaintiff.

82.   Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Ozempic, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for treatment of her Type 2 diabetes.

83.   As a direct and proximate result of using Ozempic, Plaintiff has suffered permanent vision loss, NAION, and NAION's sequelae, resulting in severe personal injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, medical expenses, loss of earnings, loss of the ability to earn money and other economic losses. The losses are permanent and continuing, and Plaintiff will suffer these losses in the future.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
(Against All Defendants)

84.   Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

85.   At all relevant times, Defendants had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Ozempic, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to

suffer from unreasonable, dangerous side effects without an adequate warning.

86. At all relevant times, Defendants knew, or in the exercise of reasonable care, should have known, of the hazards and dangers associated with Ozempic and, specifically, that use of this drug could cause NAION and its sequelae.

87. Defendants breached their duty of care to Plaintiff and Plaintiff's treating physicians by committing one or more of the following negligent acts or omissions:

a. Manufacturing, producing, marketing, and distributing Ozempic without thorough and adequate pre- and post-market testing of the product;

b. Manufacturing and distributing Ozempic while negligently and intentionally concealing and failing to disclose clinical data demonstrating the risk of serious harm, including NAION;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether Ozempic was safe for its intended use;

d. Failing to warn Plaintiff, the medical and healthcare community, and consumers that Ozempic's risk of harm was unreasonable and that safer effective alternative products were available;

e. Advertising, marketing, and recommending the use of Ozempic while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with its use;

f. Failing to ensure that Ozempic was accompanied by proper and accurate

warnings about the increased risks of NAION and optic-nerve injury;

g. Failing to conduct adequate post-marketing surveillance to determine the safety of Ozempic and its association with NAION.

88. A reasonable manufacturer, designer, distributor, promoter, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

89. As a direct and proximate result of Defendants' conduct as described above, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, medical expenses, loss of earnings, loss of the ability to earn money and other economic losses. The losses are permanent and continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, including but not limited to medical expenses, lost wages and loss of earning capacity, non-economic damages including but not limited to pain and suffering, emotional distress and the loss of enjoyment of life, attorney's fees and costs, and such other relief as this Court deems just following a trial by jury on all issues so triable as a matter of right.

## COUNT II
## NEGLIGENT FAILURE TO WARN
(Against All Defendants)

90. Plaintiff incorporates by reference each and every preceding paragraph

23

as though fully set forth herein.

91.   At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, and distributing Ozempic for use by consumers in the United States, including Plaintiff.

92.   Defendants, as the holder of the NDA for Ozempic, owed an independent and continuing duty to Plaintiff, Plaintiff's prescribing and treating physicians, and the medical community to exercise reasonable care to provide adequate warnings of the risks associated with Ozempic of which Defendants knew or, in the exercise of reasonable care, should have known. These risks include the risk of NAION and permanent vision loss.

93.   The duty to warn is independent of the duty to exercise reasonable care in the design, manufacture, testing, and surveillance of Ozempic, and is independently breached by a failure to communicate known or knowable risks to prescribers and patients.

94.   Defendants knew, or in the exercise of reasonable care should have known, of the increased risk of NAION and permanent vision loss associated with Ozempic by reason of, among other things:

(a)   the optic-ischemic-neuropathy serious adverse event reported in Defendants' own SUSTAIN FORTE clinical trial in 2021;

(b) FAERS reports of optic-ischemic neuropathy associated with semaglutide

dating to 2019;

(c) the published peer-reviewed literature, including Hathaway 2024 and the corroborating studies described herein; and

(d) the PRAC inquiry that led Defendants publicly to acknowledge confirmed cases of NAION in their clinical trials.

95.   Defendants breached the duty to warn by, among other things, failing to update the Ozempic label, prescribing information, or Medication Guide to disclose the risk of NAION; failing to issue "Dear Doctor" letters or other safety communications to the medical community; failing to communicate the risk to patients in their direct-to-consumer advertising; and failing to file a CBE supplement under 21 C.F.R. § 314.70(c) to add or strengthen a warning.

96.   Defendants' breach of the duty to warn was a substantial factor in causing Plaintiff's injuries: Had Plaintiff and Plaintiff's prescribing physicians been adequately warned of the risk of NAION, Ozempic would not have been prescribed to or used by Plaintiff, and Plaintiff would not have suffered the resulting NAION and permanent vision loss.

97.   The aforementioned negligence and wrongs done by Defendants constitute grossly negligent conduct and disregard for the rights of others, for which some states allow the imposition of exemplary or punitive damages. This is so because, when viewed objectively from Defendants' standpoint at the time their

25

conduct occurred, Defendants' conduct involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others, including Plaintiff.

98.    As a direct and proximate result of Defendants' conduct as described above, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, medical expenses, loss of earnings, loss of the ability to earn money and other economic losses. The losses are permanent and continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, including but not limited to medical expenses, lost wages and loss of earning capacity, non-economic damages including but not limited to pain and suffering, emotional distress and the loss of enjoyment of life, attorney's fees and costs, and such other relief as this Court deems just following a trial by jury on all issues so triable as a matter of right.

## COUNT III
## NEGLIGENT MISREPRESENTATION AND MARKETING
(Against All Defendants)

99.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

26

100.   At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information, or omitted or failed to disclose material information concerning Ozempic, including misrepresentations regarding its safety and known risks.

101.   The information distributed by Defendants to the public, the medical community, Plaintiff, and Plaintiff's healthcare providers—including advertising campaigns, labeling materials, print advertisements, and commercial media—was false and misleading and contained omissions and concealment of the truth about the dangers of Ozempic.

102.   Defendants had a duty to exercise reasonable care to accurately and truthfully represent to the medical community, Plaintiff, Plaintiff's healthcare providers, and the public the known risks of Ozempic, including its propensity to cause permanent vision loss, NAION, and injury to the optic nerve.

103.   Defendants made continued omissions in the Ozempic labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION, and injury to the optic nerve.

104.   In reliance upon Defendants' false and negligent misrepresentations and omissions, Plaintiff and Plaintiff's healthcare providers were induced to use Ozempic, thereby causing Plaintiff to endure severe and permanent injuries.

105. Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Ozempic had the true facts not been concealed by Defendants.

106. Defendants failed to exercise ordinary care in making representations concerning Ozempic because they negligently misrepresented Ozempic's risk of unreasonable and dangerous adverse side effects.

107. The aforementioned negligence and wrongs done by Defendants constitute the kind of grossly negligent conduct and disregard for the rights of others for which some states allow the imposition of exemplary or punitive damages. This is so because, when viewed objectively from Defendants' standpoint at the time their conduct occurred, Defendants' conduct involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others, including Plaintiff.

108. As a direct and proximate result of Defendants' conduct as described above, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, medical expenses, loss of earnings, loss of the ability to earn money and other economic losses. The losses are permanent and continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly

and severally, for compensatory damages, including but not limited to medical expenses, lost wages and loss of earning capacity, non-economic damages including but not limited to pain and suffering, emotional distress and the loss of enjoyment of life, attorney's fees and costs, and such other relief as this Court deems just following a trial by jury on all issues so triable as a matter of right.

## COUNT IV
## PRODUCTS LIABILITY – DESIGN DEFECT
(Against All Defendants)

109.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

110.    Under Massachusetts law, to demonstrate a product is defectively designed, a plaintiff must show that the product in question was made according to an unreasonably dangerous design and does not meet a consumer's reasonable expectation as to its safety.

111.    The Ozempic injections supplied to Plaintiff by Defendants were defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, provided an excessive dose for its purpose and posed a risk of the development of serious vision injuries, including but not limited to permanent vision loss, NAION, and injury to the optic nerve, to Plaintiff and other consumers.

112.    The Ozempic supplied to Plaintiff by Defendants was defective in design

29

or formulation in that its effectiveness as a medication to promote weight loss did not outweigh the risks of the development of NAION posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of the Ozempic drug makes the product unreasonably dangerous.

113.   Ozempic's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

114.   Feasible and suitable alternative designs have existed at all relevant times relevant as compared to Defendants' Ozempic, including but not limited to alternate dosing, reduced exposure, among others.

115.   At all relevant times to this lawsuit, Defendants owed a duty to consumers including Plaintiff and their health care providers, to assess, manage, and communicate the risks, dangers, and adverse effect inherent in the use of Ozempic. Defendants' duties included, but were not limited to, carefully and properly designing, testing, studying, and manufacturing Ozempic.

116.   Defendants negligently and carelessly breached the above-described duties to Plaintiff by, among other acts and omissions, negligently and carelessly:

(a)  Failing to use ordinary care in designing, testing, and manufacturing Ozempic;

(b)  Failing to design Ozempic as to properly minimize the adverse effects to

the optic nerve;

    (a) Failing to counteract in the design the known adverse effects on the optic nerve;

    (b) Designing a product where the benefits were greatly outweighed by the risks of permanent vision loss, NAION, and injury to the optic nerve.

117.　Furthermore, Ozempic was defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation.

118.　At all reasonable times, given its lack of efficacy and increased safety risks, Ozempic did not meet the reasonable expectations of an ordinary consumer, particularly the Plaintiff, or in the alternative, her medical providers.

119.　Ozempic was defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, it was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other similar drugs.

120.　Despite Defendants' knowledge of the foreseeable risks and unreasonably dangerous nature of Ozempic at all times relevant, Defendants designed and brought the product to market and continued to market the drug when there were safer alternatives available, including but not limited to alternate dosing, reduced exposure, among others.

121. Defendants' recklessness and Ozempic's failures arise under circumstances precluding any other reasonable inference other than a defect in Ozempic.

122. At all times material herein, Defendants had a duty to exercise reasonable care and had the duty of an expert in all aspects of the design, formulation, manufacture, compounding, testing, inspection, packaging, labeling, distribution, marketing, promotion, advertising, sale, testing, and research to assure the safety of Ozempic when used as intended or in a way that Defendants could reasonably have anticipated, and to assure that the consuming public, including Plaintiff and Plaintiff's physicians, obtained accurate information and adequate instructions for the safe use or non-use of Ozempic.

123. At all times material herein, Defendants failed to exercise reasonable care and the duty of an expert and knew, or in the exercise of reasonable care should have known, that Ozempic was not properly manufactured, designed, compounded, tested, inspected, packaged, distributed, marketed, advertised, formulated, promoted, examined, maintained, sold, prepared, or a combination of these acts.

124. Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Ozempic was a proximate cause of Plaintiff's injuries and damages.

125. Defendants' reckless disregard for the design of Ozempic was a

proximate cause of Plaintiff's injuries and damages.

126. The risk of the development of serious injuries to the optic nerve, including but not limited to NAION, was reasonably foreseeable at the time of sale and could have been discovered by way of reasonable testing prior to marketing the product. Defendants recklessly failed to conduct such reasonable testing.

127. As a result of Defendants' negligent and reckless design, Plaintiff sustained severe and ongoing injuries.

128. As a direct and proximate result of Defendants' conduct as described above, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, medical expenses, loss of earnings, loss of the ability to earn money and other economic losses. The losses are permanent and continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, including but not limited to medical expenses, lost wages and loss of earning capacity, non-economic damages including but not limited to pain and suffering, emotional distress and the loss of enjoyment of life, attorney's fees and costs, and such other relief as this Court deems just following a trial by jury on all issues so triable as a matter of right.

## COUNT V
## BREACH OF EXPRESS WARRANTY
(Against All Defendants)

129.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

130.     Defendants expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public—through publications, labeling, the internet, and other communications intended for physicians, patients, and the general public—that Ozempic was safe, effective, and fit and proper for its intended use.

131.     Ozempic materially failed to conform to those representations because it caused serious and permanent NAION and optic-nerve injury when used as intended. Defendants' failures constitute a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Ozempic.

132.     Defendants expressly warranted that Ozempic was safe and well-tolerated. But Defendants did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Ozempic was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision.

133.     Plaintiff and Plaintiff's physicians justifiably relied on Defendants' representations regarding the safety of Ozempic, and those representations formed part of the basis of the bargain for Plaintiff's decision to purchase and use Ozempic.

134.     As a direct and proximate result of Defendants' conduct as described

above, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, medical expenses, loss of earnings, loss of the ability to earn money and other economic losses. The losses are permanent and continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, including but not limited to medical expenses, lost wages and loss of earning capacity, non-economic damages including but not limited to pain and suffering, emotional distress and the loss of enjoyment of life, attorney's fees and costs, and such other relief as this Court deems just following a trial by jury on all issues so triable as a matter of right.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Against All Defendants)

135.    Plaintiff incorporates by reference each and every preceding Paragraph as though fully set forth herein.

136.    At all relevant times, Defendants impliedly warranted that Ozempic was of merchantable quality, safe, and fit for the ordinary purposes for which such drugs are used.

137.    Defendants breached this implied warranty because Ozempic was not of merchantable quality and was not safe for its ordinary intended use, in that Ozempic caused serious, permanent optic-nerve damage and NAION when used as

35

intended.

138.    As a direct and proximate result of Defendants' conduct as described above, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, medical expenses, loss of earnings, loss of the ability to earn money and other economic losses. The losses are permanent and continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, including but not limited to medical expenses, lost wages and loss of earning capacity, non-economic damages including but not limited to pain and suffering, emotional distress and the loss of enjoyment of life, attorney's fees and costs, and such other relief as this Court deems just following a trial by jury on all issues so triable as a matter of right.

## COUNT VII
## FRAUDULENT CONCEALMENT / FRAUD BY OMISSION
(Against All Defendants)

139.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

140.    Defendants had a duty to disclose to Plaintiff, Plaintiff's healthcare providers, and the general public the known risks associated with Ozempic, including the risk of NAION and permanent optic-nerve injury.

141.    Defendants actively and intentionally concealed and suppressed

36

material facts concerning the safety and efficacy of Ozempic —specifically, the causal relationship between Ozempic use and NAION—with knowledge that Plaintiff and Plaintiff's healthcare providers did not have access to such information and would not have used or prescribed Ozempic had such information been disclosed.

142.     Defendants' concealment was willful and wanton and was undertaken for the purpose of expanding the market for Ozempic and maximizing Defendants' revenues, at the expense of the health and safety of patients including Plaintiff.

143.     Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendants' omissions in deciding to use and prescribe Ozempic, and such reliance was reasonable under all circumstances.

144.     As a direct and proximate result of Defendants' conduct as described above, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, medical expenses, loss of earnings, loss of the ability to earn money and other economic losses. The losses are permanent and continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, including but not limited to medical expenses, lost wages and loss of earning capacity, non-economic damages including but not limited to pain and suffering, emotional distress and the loss of

37

enjoyment of life, attorney's fees and costs, and such other relief as this Court deems just following a trial by jury on all issues so triable as a matter of right.

## COUNT VIII
### FRAUDULENT MISREPRESENTATION
(Against All Defendants)

145.    Plaintiff incorporates by reference each and every preceding Paragraph as though fully set forth herein.

146.    Defendants made affirmative material misrepresentations of fact concerning Ozempic to Plaintiff, Plaintiff's prescribing physicians, the medical community, and the general public, including but not limited to representations that Ozempic was "safe," "well-tolerated," had a "proven safety and efficacy" profile, and that its side-effect profile was minimal and primarily limited to gastrointestinal effects.

147.    Defendants' misrepresentations were communicated through, among other channels, the Ozempic label and prescribing information, press releases, product packaging, the "Truth About Weight" and other Defendant-operated websites, direct-to-consumer television advertising campaigns and commercials, more than 4,000 Facebook and Instagram advertisements, the Defendants' partnership with Meta, presentations and communications to physicians and key opinion leaders, and detailing materials provided to healthcare providers.

148.    The representations described above were false when made, in that

Ozempic posed a substantially elevated risk of NAION and permanent vision loss that Defendants did not disclose.

149.    Defendants knew the representations were false when made, or made them with reckless disregard for the truth, given that Defendants knew about the optic-ischemic-neuropathy serious adverse event in Defendants' own SUSTAIN FORTE trial reported in 2021, the FAERS reports of optic-ischemic neuropathy associated with semaglutide dating to 2019, internal pharmacovigilance data, and the surge of NAION cases observed at Massachusetts Eye and Ear that gave rise to the Hathaway study.

150.    Defendants intended that Plaintiff, Plaintiff's prescribing physicians, and the medical community rely on the misrepresentations in deciding to prescribe and use Ozempic.

151.    Plaintiff and Plaintiff's prescribing physicians justifiably relied on Defendants' misrepresentations, and that reliance was reasonable in light of Defendants' superior knowledge of Ozempic's risks, the FDA-approved label, and the absence of any disclosure of the NAION risk in Defendants' marketing or labeling.

152.    Had Plaintiff and Plaintiff's prescribing physicians known the truth concerning the risk of NAION, Ozempic would not have been prescribed to or used by Plaintiff.

153.    As a direct and proximate result of Defendants' fraudulent misrepresentations as described above, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, medical expenses, loss of earnings, loss of the ability to earn money and other economic losses. The losses are permanent and continuing, and Plaintiff will suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages, including but not limited to medical expenses, lost wages and loss of earning capacity, non-economic damages including but not limited to pain and suffering, emotional distress and the loss of enjoyment of life, attorney's fees and costs, and such other relief as this Court deems just following a trial by jury on all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced Counts, and respectfully asks the Court to do the following:

1. Award Plaintiff compensatory damages for past and future pain and suffering, permanent vision loss, disability, emotional distress, loss of enjoyment of life, and all other non-economic damages permitted by applicable law;

2. Award Plaintiff economic damages, including all past and future medical

expenses, costs of care, lost wages, lost earning capacity, and other economic losses caused by Plaintiff's use of Ozempic;

3. Award Plaintiff pre-judgment and post-judgment interest as allowed by law;

4. Award Plaintiff costs of suit, including reasonable attorneys' fees as permitted by law; and

5. Grant such other and further relief as the Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all claims triable by jury in this action.

Date: July 15, 2026

Respectfully Submitted,

/s/ Julie E. Lamkin
Julie E. Lamkin (MA Bar# 680482)
Robert T. Naumes, Jr. (MA Bar# 664826)
JEFFREY GLASSMAN INJURY
LAWYERS
One International Place, Suite 1810
Boston, MA 02110
Phone: (617) 279-1000
Fax: (617) 722-9999
jlamkin@jeffreysglassman.com
bnaumes@jeffreysglassman.com

Attorneys for Plaintiff

41